Filed 7/1/13  In re D.Y. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.Y., et al., Persons Coming Under the Juvenile Court Law. | B245144 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK87038) |
| Plaintiff and Respondent, | |
| v. | |
| W.Y., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Phillip L. Soto, Judge.  Affirmed.

Roland Koncan, under appointment by the Court of Appeal, for Defendant and Appellant W.Y.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Glenda C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court asserted dependency jurisdiction over D.Y. and K.Y., the two children of Glenda C. (mother) and W.Y. (father). On the day set for a Welfare and Institutions Code section 366.26 hearing, counsel for mother and father requested a contested hearing.[1] Neither parent was present in court. The juvenile court requested an offer of proof. Following mother's counsel's offer of proof, the court denied the requests for a contested hearing and terminated parental rights. On appeal, the parents contend the juvenile court violated their due process rights by denying them a contested hearing. They also argue the juvenile court erred in refusing to apply the parent-child beneficial relationship exception to adoption. We find no error and affirm the trial court order.

## FACTUAL AND PROCEDURAL BACKGROUND

K.Y. was born in March 2011. At birth he tested positive for cocaine and marijuana, as did mother. Mother admitted she had used cocaine and marijuana three days before K.Y. was born. Father claimed he was unaware of mother's drug use. He admitted that he used marijuana; as of March 2011 he had an expired medical marijuana prescription. The Los Angeles County Department of Children and Family Services (DCFS) detained K.Y. at the hospital, and also detained three-year-old D.Y. In April 2011, the parents pled no contest to a dependency petition asserting the children were persons described by section 300.

A multidisciplinary assessment team (MAT) evaluated the family and completed a report in June 2011. The assessor noted D.Y. demonstrated poor boundaries by attempting to sit on the assessor's lap; the paternal grandmother also reported D.Y. often spoke to strangers, on two occasions sat on the laps of strange men, and ran away in public places to greet strangers. Mother reported D.Y. had a special bond with father and spent most of her time with him. The assessor noted D.Y. was unable to engage in age-appropriate communication. Mother, however, disagreed and would not consent to have D.Y. evaluated for speech or developmental delays. Mother also indicated she would not allow D.Y. to attend a public preschool program because she wanted D.Y. to attend a

---

[1]     All further statutory references are to the Welfare and Institutions Code.

private school. Mother said D.Y. had not been seen by a pediatrician since age two because she did not have health insurance.

The assessor described mother as angry, hostile, and not open to recommendations. Father was quiet during most of the interview, although he acknowledged better communication was needed with the paternal grandmother to have more consistent visits.

The children first were placed with their paternal grandmother, and subsequently moved to a foster family. In late 2011, DCFS placed the children with their maternal grandparents in Shasta County. Mother's three older children, ages 9, 11, and 12, had lived with the maternal grandparents for the previous 10 years. At one point, mother and the three children lived with the maternal grandparents in Southern California. There was no dependency history for the older children. However, when the maternal grandparents moved to Shasta County, mother agreed to have the maternal grandparents raise the three older children. Mother reported she visited the older children every few months and called on a daily basis.[2]

*Visitation*

Between March and December 2011, the parents visited K.Y. and D.Y. (collectively the children) only sporadically, including while the children were living with the paternal grandmother. Paternal grandmother reported that at one visit in May 2011, she discovered mother breastfeeding D.Y. Mother told the grandmother the court orders did not prohibit her from breastfeeding D.Y.; the grandmother reported D.Y. was

---

[2]  In March 2011, the maternal grandparents provided a letter to DCFS indicating they could not attend an upcoming placement meeting due to the older children's school and schedule of extracurricular activities. However, they expressed their concern for D.Y. and K.Y. They indicated they were prepared to take the children in, and to make any necessary adjustments to keep all of the siblings together. They also provided two letters of reference attesting to their care of the three older children, both of which noted the grandparents' commitment and dedication in parenting mother's older children.

3

ill later that evening "to the point of vomiting."[3]  The paternal grandmother also reported mother spent most of her time holding K.Y. during visits.

Mother told DCFS the parents were unable to visit the children due to work and program schedules.[4]  Between late June and late October 2011, the parents contacted the children only once.  In October 2011, father began visiting the children.  DCFS reported that at one October visit, father seemed disconnected, did not engage with the children, left D.Y. to play with other children, and did not know what to do when K.Y. began to cry.  Father asked to end the visit early.  At a second October visit, father engaged more with the children but only stayed for one hour of the two-hour scheduled visit.  Father tried to feed seven-month-old K.Y. Cheetos, which led to K.Y. coughing "in a choking manner."  The foster mother had to intervene.  In October 2011, mother told a social worker she would try to begin visiting the children with father.  She said she had not been able to visit previously because she was attending court-ordered programs.  The social worker noted, however, that mother had been discharged from her drug rehabilitation program for non-attendance in August 2011.

Once DCFS placed the children with the maternal grandparents in December 2011, the parents regularly contacted the children by telephone and internet video calls (Skype).  Beginning in February 2012, the parents traveled to Shasta County once each month to visit the children in person.  In June 2012, the parents moved to Shasta County and visited the children on an almost daily basis, "at baseball games, football games, birthday parties and at the park."  Visits also took place at the parents' home or the maternal grandparents' home.  In October 2012, the maternal grandmother reported the visits were "great."  She also reported: "[D.Y.] loves her parents very much and like[s]

---

[3]     Mother told the MAT assessor she only breastfed D.Y. for two weeks after she was born.

[4]     In April 2011, Mother was working full time at a car repair shop where she had been employed since 2007.  Father worked at a nursing home and had maintained the same job for 15 years.

spending as much time with them as our schedules allow. [K.Y.] has gotten to know his parents and enjoys playing with his parents."

### Parents' Progress in Case Plans

Father submitted eight required clean random drug tests, and continued providing clean tests. He also completed parenting and domestic violence classes. He received counseling services but did not secure a completion certificate. Mother, however, had numerous missed or diluted random drug tests. She was discharged from two substance abuse programs due to non-attendance. Social workers noted father deferred to mother on family issues and the parents continued living together. DCFS opined father had not shown himself able to protect the children from risks or harm in the home.

### Review Hearings and Reports

In November 2011, the court held a contested hearing pursuant to section 366.21, subdivision (e). The parents objected to the DCFS recommendation that the court terminate reunification services. The parties stipulated that, if called, father would testify that between March and June 2011, he visited the children as much as the court-ordered minimum. From late June 2011 until mid-September 2011, he did not visit the children because of his work schedule and because the children's caregiver was only able to accept visits during weekdays. The parties further stipulated father would testify that from mid-September to late October 2011, he visited the children once a week in a conjoint counseling setting.

Mother testified she initially had difficulty getting to her assigned drug testing facility from her job. Mother testified the testing facility was in Van Nuys, yet she worked in Glendale, helping to run an auto body shop. She sometimes needed to work until 7:00 or 8:00 p.m. According to the DCFS report, mother missed one random test in August, and three in a row between September 6 and October 4, 2011. Mother explained she missed one test because she could not get away from work, on another occasion she had a "menstrual mishap," and on another occasion the facility was closed when she arrived. Mother asserted the social worker did not allow her to provide an on-demand test. In July 2011, she requested a different testing facility; the request was granted in

5

September 2011. Mother explained she had diluted tests in May, June, and July because she worked outside in those months and drank a lot of water. Although she had worked at the auto body shop for four years, mother testified she was terminated after taking a quick break one day in late October.[5] She was unemployed at the time of the hearing.

Mother testified she completed 36 sessions of group drug counseling, was not in a program for two months, then enrolled in a new program. She explained she left the first program because it "kept changing the dollar amounts"; she was the only "cash patient," and they did not give her a completion certificate. After leaving she conducted research to try to find a facility that would meet her needs, however she was denied acceptance from one program before she found another. She testified that although she completed parenting classes, the program could not find her file to give her a completion certificate.

Mother testified that when the children were placed with the paternal grandmother, she visited them every week, for 11 hours each week. However, she did not visit them often once they were placed in a foster home. Mother said the social worker did not set up a visitation schedule, she could not visit because DCFS could not provide a monitor, and the foster mother could not accommodate weekend or weeknight visits. Mother was unable to find a monitor. Mother also tried calling the foster mother to ask about the children but had difficulty communicating with her because she spoke only Spanish.

Mother further testified that before 2006, she and the three older children were living with her parents in Ventura, where she managed a car dealership. Mother's parents decided to retire and move to Shasta County. Because mother was single, she decided to let her parents take the three children so they would not be "latch-key" kids. Mother asserted she called the children every other day, and gave her mother $500 each month to care for the children.

---

[5] According to mother, she went to her car to call the DCFS social worker. Her supervisor knocked on her car window and asked her to return to work. Mother asked the supervisor to give her "a second." The following Monday she "didn't have a job anymore."

Counsel for DCFS argued mother's testimony conflicted with multiple DCFS reports indicating the department had set up visitation plans; mother failed to visit the children regularly when they were placed with the paternal grandmother; it was not credible that mother's drug tests were diluted because she drank a lot of water; and mother's drug rehabilitation program terminated her for lack of compliance.

The court indicated it did not find mother particularly credible. However, it allowed the parents additional reunification services. The court ordered the parents back for a section 366.21, subdivision (f) hearing on May 22, 2012.

A May 22 DCFS report indicated the social worker had been unable to get in touch with father. He had not returned telephone calls or written communications. Mother was terminated from her drug rehabilitation program in April 2012 due to nonattendance. However, mother's drug testing had become more consistent, with only one missed test between November 2011 and March 2012. DCFS reported the maternal grandparents continued to care for the children, including by participating in developmental services with them, attending regular medical appointments, maintaining a supportive and nurturing home environment, and facilitating a bond between the children and their three older half-siblings.

Father was present for the May 22 hearing. Mother was not. Mother's counsel reported father had brought a note from mother indicating she was ill and could not come to court. Counsel for both parents requested a contested hearing under section 366.21, subdivision (f). The court granted father's request that it order DCFS to consider whether the children could be placed with him if he moved in with the maternal grandparents in Redding, in Shasta County. The court set a contested hearing for June 26.

On June 22, DCFS provided a last minute information for the court indicating mother had given birth to another child in early June 2012. At the hospital, mother indicated she planned to move to Redding. Father did not speak to the DCFS worker, but instead "kept his face turned with an article of clothing covering a portion of his face." Days later, an emergency DCFS worker reported mother, father, and the newborn were living together in a filthy and cluttered home that, for the past two months, did not have

7

electricity or gas. Subsequent efforts to get in touch with the parents were unsuccessful. In late May, the maternal grandfather told a DCFS worker there was not enough room in the maternal grandparents' home for the parents to live with them. He did not know where the parents were intending to move.

Only father attended the June 26 hearing. Mother told her counsel she could not attend the court hearing due to financial difficulties. DCFS's counsel offered several DCFS reports as evidence. The parents, through counsel, did not object or seek to challenge the evidence. Neither parent offered any affirmative evidence. Both parents requested additional reunification services. Father's counsel reported father had moved to Shasta County. He was living in a motel while looking for work and a new residence. Mother's counsel reported mother was living in a different motel. Counsel also reported mother was not enrolled in a substance abuse program, although she was participating in a 12-step program. Counsel indicated she believed mother's new baby was born "clean from all substances." Mother asked counsel to communicate that she did not believe the social worker was assisting the maternal grandparents in the care of the children, and the worker was even less helpful to the parents.

The juvenile court terminated the parents' reunification services. The court set a section 366.26 hearing for October 23, 2012. In the DCFS section 366.26 report, the department reported the maternal grandparents wished to adopt the children. The grandparents indicated they were "frustrated" with mother's choices and they would not allow her to have contact with the children if they felt her behavior would affect the children negatively.

### *Section 366.26 Hearing*

At the October 23, 2012 hearing, the parents were not present.[6] Counsel for parents asked the court to set the matter for a contested hearing. The court asked for an offer of proof. Mother's counsel responded: "The bond, the .26(c)(1)(b)(i) exception."

---

[6] When mother's counsel stated her appearance she noted: "[Mother is] not present. It is ten to 9:00 a.m., your Honor, and the parties were ordered back at 8:00 a.m."

8

The court asked who counsel planned to have testify. Mother's counsel answered: "Probably the mother, at least, and maybe maternal grandmother." Father's counsel did not make a separate offer of proof. Counsel for both parents informed the court they had not been in contact with the parents. The court denied the request to set the matter for contest, explaining: "Unless I have some reasonable expectation that they are going to actually come in – I'll go ahead and hear argument – but I don't see any cause to go over longer than this. [¶] Notices have been made properly. The parents were given plenty of opportunity to come to court. Personal service was made on the mother and, I believe, we had personal service on the father, too . . . . I'll certainly give you reasonable time to argue about an exception. You are welcome to argue it, but I will not put it over to have mother show up who didn't show up today."

Mother's counsel argued as follows:

"As I stated earlier, unfortunately, my client is not here. I think she would want to testify. I know that according to the report, the children are with the maternal grandmother or the grandparents and the children are quite young. But I know that [D.Y.], at least, has a bond with her mother. On page six of today's .26 report, the grandparents report that the visits are great. That [D.Y.] loves her parents very much. She's four years old. And she loves her parents very much and she likes to spend time with them. [K.Y.] is younger. He's only one. It says that he's gotten to know his parents. It looks like there may be a bond there. I believe it may be detrimental to sever this bond with the parents and without having my client here. That's all the information that I do have for the court at this time."

Father's counsel joined in mother's counsel's argument. He further noted father had moved to Redding to be close to the children and to have a relationship with them.

After hearing argument, the court concluded the children were adoptable, and no exception to adoption applied. The court explained: "[A]lthough there is some kind of a relationship between the parents and the children, the children are with maternal relatives.

9

They are doing quite well in that home. They have a relationship with them that is that of a parent and child. It would not benefit them, the relationship between these parents and the children, that would outweigh the permanency that these children would be getting with maternal relatives in Shasta County. And even though there are visits that are going on, that does not rise to the level of a parental relationship that outweighs severing this natural relationship and freeing the children up for adoption." The parents' appeals followed.

## DISCUSSION

### I. The Trial Court Did Not Err in Denying a Contested Hearing, or in Requesting an Offer of Proof

Both parents assert the juvenile court violated their rights to due process by denying their requests for a contested hearing.[7] The parents contend the court should have provided them the opportunity to present evidence on the applicability of the beneficial parent-child relationship exception to adoption. We find no error.

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds by clear and convincing evidence it is likely the child will be adopted if parental rights are terminated. However, the court will not terminate parental rights if it determines doing so would be detrimental to the child based on one of several statutory exceptions. (§ 366.26, subd. (c)(1)(B).) The party challenging termination of parental rights bears the burden of proving that one or more of the statutory exceptions applies. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)

---

[7]  The parents do not contend they failed to receive adequate or proper notice of the hearing. We disagree with respondent's suggestion that the parents' request should be analyzed as a motion for a continuance. Allowing for a contested hearing apparently would have had the effect of continuing the proceedings. But we cannot ignore that what the parents actually requested was a contested hearing, which would have entailed more than simply delaying the proceedings.

To establish the beneficial parent-child relationship exception, the parents had to prove termination of parental rights would be detrimental to the children because 1) the parents maintained regular visitation and contact with them, and 2) the children would benefit from continuing their relationship with the parents. (§ 366.26, subd. (c)(1)(B)(i).) " 'Sporadic visitation is insufficient to satisfy the first prong . . .' of the exception. [Citation.] Satisfying the second prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial,* positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.] Evidence that a parent has maintained ' "frequent and loving contact" is not sufficient to establish the existence of a beneficial parental relationship.' [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

"Because a parent's claim to . . . an exception [to termination of parental rights] is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

Section 366.26 sets forth procedures for hearings terminating parental rights. At the hearing, the court is to review reports provided by the social services agency, and "shall receive other evidence that the parties may present . . . ." (§ 366.26, subd. (b).) Father argues the court denied his right to a hearing and did not request an offer of proof. Mother contends the court erred by conditioning her right to a contested hearing on a successful offer of proof.

In *In re Tamika T.* (2002) 97 Cal.App.4th 1114 (*Tamika T.*), our colleagues in Division Four of this court rejected arguments similar to those the parents assert here. In *Tamika T.,* the juvenile court set a section 366.26 hearing. The mother's whereabouts were unknown for over a year. When mother resurfaced, she requested a contested hearing. The court set a hearing date, conditioned upon an offer of proof from the

11

mother.  (*Id.* at p. 1118.)  On the date of the hearing, mother's offer of proof was that she had maintained an emotional bond with the child, had written to her recently, and it would be in the child's best interests to have contact with the mother.  (*Ibid.*)  The juvenile court determined the mother's offer of proof was insufficient, concluded no exceptions to adoption applied, and terminated the mother's parental rights.  (*Id.* at p. 1119.)  The mother appealed, arguing she had a due process right to a contested hearing on the applicability of the beneficial parent-child relationship exception to adoption, and the juvenile court had no discretion to require an offer of proof before conducting a contested hearing.  (*Id.* at p. 1120.)

The Court of Appeal, quoting its earlier opinion in *In re Jeanette V.* (1998) 68 Cal.App.4th 811 (*Jeanette V.*), explained that while a parent "of course . . . has a right to due process" at a section 366.26 hearing, " 'due process is not synonymous with full-fledged cross-examination rights.  [Citation.]  *Due process is a flexible concept which depends upon the circumstances and a balancing of various factors.*  [Citation.]  *The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.*  [Citations.]  Even where cross-examination is involved, the trial court may properly request an offer of proof if an entire line of cross-examination appears to the court to be irrelevant to the issue before the court.  [Citations.]'  [Citation.]"  (*Tamika T., supra,* 97 Cal.App.4th at p. 1120, italics in original.)  The court concluded requiring an offer of proof before setting a contested hearing on the beneficial relationship exception did not violate the mother's right to due process.  The *Tamika* court further noted mother's offer of proof was only a conclusory statement that she had maintained an emotional bond with the child.  (*Id.* at p. 1121.)  The court thus explained:

"Because due process is, as we noted in [*Jeanette V.,*] a flexible concept dependent on the circumstances, the court can require an offer of proof to insure that before limited judicial and attorney resources are committed to a hearing on the issue, mother had evidence of significant probative value.  If due process does not permit a parent to introduce irrelevant evidence, due process does not require a court to hold a contested

12

hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest. The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s) so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses. . . . We therefore conclude it does not violate due process for a trial court to require an offer of proof before conducting a contested hearing on one of the statutory exceptions to termination of parental rights." (*Tamika, T., supra,* at p. 1122.)

The *Tamika T.* court also distinguished *In re James Q.* (2000) 81 Cal.App.4th 255 (*James Q.*). In *James Q.*, the court found it improper to require a party to a review hearing to tender an offer of proof as a condition to obtaining a contested hearing. (*James Q.*, at p. 266.) The *Tamika T.* court noted *James Q.* considered due process rights in connection with a section 366.21, subdivision (e) hearing, and distinguished the case on that basis. (*Tamika T.,* at p. 1122.) Further, the *Tamika T.* court disagreed with the reasoning of *James Q.*, explaining it did not adequately acknowledge that due process is a flexible concept in dependency proceeding. (*Tamika T.*, at p. 1123.)

We agree with the *Tamika T.* court's reasoning. In this case, as in *Tamika T.*, the juvenile court did not violate the parents' due process rights by requesting an offer of proof in connection with their request for a contested hearing, or by refusing to conduct a contested hearing upon finding the offer of proof insufficient. (*In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053.) The parents' right to present evidence was limited to "relevant evidence of significant probative value to the issue before the court." The only issue the parents raised was the applicability of the beneficial relationship exception. They had the burden of proof on this issue. (See *In re Thomas R.* (2006) 145 Cal.App.4th 726, 732 [on court's demand for offer of proof, distinguishing between issues on which department has burden of proof, and issues on which parent has burden of proof].)

Here, the parents were not present and had not been in contact with their counsel. Mother did not appear at the previous two hearings, including the contested hearing at which the court terminated reunification services. In the more than 18 months since the

13

dependency proceedings began, the parents had only visited, the children regularly in the last four months. Both children were under five years old. K.Y. was detained when he was only days old. He had not been in the parents' care since the original detention. DCFS reports indicated the maternal grandparents had been fulfilling a parental role for the children since December 2011. Before granting a request that would delay the proceedings, and therefore further postpone the implementation of a permanent and stable arrangement for the children, the trial court could properly request an offer of proof to determine whether the parents' proposed evidence would be of significant probative value. (*In re Zeth S.* (2003) 31 Cal.4th 396, 412-413 (*Zeth S.*) [state has a strong interest in the "expeditiousness and finality" of juvenile dependency proceedings].)

We also disagree that the facts of *Tamika T.* significantly distinguish it from this case, rendering its legal analysis inapplicable here. In *Tamika T.*, the evidence was undisputed that the mother had not maintained regular visitation for a period of years. (*Tamika T.*, *supra,* 97 Cal.App.4th at p. 1121.) The mother told the court her last visit with her child was 18 months earlier. (*Id.* at p. 1121.) As the *Tamika T.* court noted, the juvenile court in that case could "reasonably be skeptical whether mother could offer probative evidence on the regular visitation and contact exception." (*Id.* at p. 1122.) However, the court's analysis was not limited to those specific facts because the mother contended the juvenile court had no right to request an offer of proof, regardless of the facts. (*Ibid.*) In response to that contention, the *Tamika T.* court concluded the juvenile court may require an offer of proof before committing limited judicial and attorney resources to a contested hearing. The court acknowledged that a parent has a right to a contested hearing on the exceptions to termination of parental rights. But it explained: "The real issue is whether due process makes that right absolute so as to preclude a court from requiring a parent to make an offer of proof before a contested hearing is held." (*Id.* at p. 1123.) The court concluded due process does *not* preclude a court from requiring an offer of proof before allowing a parent to present evidence on a contested issue at a section 366.26 hearing. (*Id.* at p. 1124.) We do not understand *Tamika T.* to stand for the narrow proposition that the court may only require an offer of proof without

14

offending due process if the evidence already in the record establishes the parent has no legitimate chance of proving an exception to adoption will apply.

Moreover, this case is not dissimilar from *Tamika T.* in that, on the evidence before it, the juvenile court here could reasonably question whether the parents would offer additional significant probative evidence on the parent-child beneficial relationship exception. Even though mother requested a contested section 366.21, subdivision (f) hearing, she did not appear at that hearing. At that contested hearing, the parents' counsel did not present any affirmative evidence or challenge the DCFS reports. Further, as noted above, K.Y. had lived in the parents' care only the first few days of his life. The parents had only recently started regular, consistent visitation. While the section 366.26 report was fairly brief, earlier reports also lacked details suggesting the parents served a parental role for the children, the children had any significant emotional attachment to the parents, or that severing the parent-child relationship would greatly harm the children. On these facts, the juvenile court could reasonably request an offer of proof before setting the matter for a contested hearing.

Mother asserts the juvenile court denied a contested hearing because she was not present, and the court's decision was unrelated to the offer of proof. We disagree. The juvenile court asked for an offer of proof after the parents requested a contested hearing, then, after hearing mother's offer, indicated it saw no basis to delay the proceedings for a contested hearing. On this record, we must conclude the juvenile court considered mother's offer of proof, which it had requested, and found it insufficient to warrant a contested hearing. (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1271 [on appeal we indulge all presumptions to support lower court order on which record is silent; review is of ruling, not reasons].)

On appeal, the parents also assert they eventually made it to court on the date of the section 366.26 hearing, as evidenced by the fact that their notices of appeal were signed and filed on that date. Even were we to accept the notices of appeal as evidence the parents came to court on the date of the hearing, it would not change our conclusion

15

that the juvenile court did not violate their due process rights by requesting an offer of proof before setting the matter for a contested hearing, or in finding the offer insufficient.

Both parents were represented by counsel. At the time of the hearing, the juvenile court had no indication the parents were on their way to court, or that they had any intention of appearing. Mother had missed the previous two hearings. Neither counsel suggested the parents were on their way to court. Indeed, the court *asked* the parents' attorneys if they had been in contact with their clients. They had not. We cannot find error in the juvenile court's failure to act based on information it could not have had. (*Zeth S., supra,* 31 Cal.4th at pp. 405-406, 413 [appellate court may not consider postjudgment evidence to reverse juvenile court order terminating parental rights; appeal reviews the correctness of judgment at the time of rendition, upon a record of matters which were before the trial court for its consideration]; § 366.26, subd. (i) [after making order terminating parental rights, court has no power to set aside, change, or modify it, except by direct appeal].) And, even if we were to consider evidence of what caused the parents to be absent from the .26 hearing or the circumstances surrounding the filing of the notices of appeal, there is nothing before us that in fact sheds light on these events.

But more importantly, we do not agree the record demonstrates the juvenile court requested an offer of proof, or found it insufficient, simply because the parents were not present. "After reunification efforts have failed, it is not only important to seek an appropriate permanent solution—usually adoption when possible—it is also important to *implement* that solution reasonably promptly to minimize the time during which the child is in legal limbo. A child has a compelling right to a stable, permanent placement that allows a caretaker to make a full emotional commitment to the child. [Citation.] Courts should strive to give the child this stable, permanent placement, and this full emotional commitment, as promptly as reasonably possible consistent with protecting the parties' rights and making a reasoned decision." (*In re Celine R.* (2003) 31 Cal.4th 45, 59.) The juvenile court could properly request an offer of proof before setting a contested hearing, in line with its obligation to seek and implement a permanent solution for the children as promptly as possible, and without violating the parents' due process rights.

**II.    The Trial Court Did Not Err in Finding Mother's Offer of Proof Insufficient**

Father asserts the juvenile court failed to request an offer of proof. This is incorrect. The juvenile court specifically asked counsel for an offer of proof. Father's counsel did not make one. Mother's counsel did make an offer; on appeal mother contends it was sufficient to warrant a contested hearing. We conclude the trial court did not abuse its discretion in finding her offer of proof insufficient. (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 759 (*Ingrid E.*).)

The *Tamika T.* court explained that an offer of proof "must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*Tamika T., supra,* 97 Cal.App.4th at p. 1124.) In *Tamika T.*, the mother's offer of proof was clearly insufficient because, in addition to simply being a conclusory statement, the evidence she described would not have established the beneficial parent-child relationship applied.[8] In this case, however, the parents did not even describe any evidence. Mother's only offer of proof was a statement that counsel would elicit evidence regarding the beneficial relationship exception, and "probably" she, in addition to "possibly" the maternal grandmother, would testify about mother's bond with the children. Mother's counsel provided no statement of actual evidence mother would present. She did not mention cross-examination, or highlight any portion of the DCFS reports mother would seek to challenge. The juvenile court reasonably found this offer of proof insufficient to warrant a contested hearing on the beneficial relationship exception.

Mother's reliance on *Ingrid E.* for a contrary result is misplaced. In *Ingrid E.*, the mother provided a written statement that "set forth the elements of proof that she hoped to establish at the hearing. Those elements included not merely the names of prospective witnesses, but also a summary of the issues relevant to the expected testimony of those witnesses." (*Ingrid E., supra,* 75 Cal.App.4th at p. 759.) The Court of Appeal concluded the juvenile court erred in finding this offer of proof insufficient to trigger a contested

---

[8]    In fact, the mother did not contend her offer of proof was sufficient to trigger a contested hearing. (*Tamika, supra,* at p. 1121.)

17

review hearing under section 366.22. (*Id.* at pp. 756, 759.) Here mother, through counsel, did not describe the elements of proof, or any facts she hoped to establish at the hearing. Counsel offered only the most general summary of the issues she expected mother's or maternal grandmother's testimony to address. Unlike the mother's offer of proof in *Ingrid E.,* mother's offer here was exceedingly minimal and generic. Thus, *Ingrid E.* does not support mother's arguments.

Even if we consider counsel's argument as part of the offer of proof, the juvenile court could still reasonably find the offer insufficient. Mother's counsel explicitly admitted the only information she had was that included in the DCFS section 366.26 report. This information was already before the court. A contested hearing was not necessary to introduce evidence already in the record. In making an offer of proof, it was incumbent on the parents to describe *other* evidence, such as the nature and quality of the relationship between the parents and the children, or evidence to prove severing the parental relationship would be detrimental to the children. Mother's offer of proof did not identify any such evidence. Under any standard of review, the trial court did not err in finding the offer of proof insufficient to trigger a contested hearing.

## III. Substantial Evidence Supported the Juvenile Court Finding that No Exception to Adoption Applied

The parents argue the trial court erred in finding the beneficial parent-child relationship exception to adoption did not apply. We disagree.

"[T]he review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. [Citation.] . . . . [T]he juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' (§ 366.26, subd. (c)(1)(B); [Citation.].) This

18

' "quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 (*K.P.*).)

The beneficial relationship exception only applies when there is a relationship that promotes the child's well-being to such a degree that it outweighs the well-being the child would gain in a permanent, stable home with adoptive parents. (*K.P., supra,* 203 Cal.App.4th at pp. 621-622; *In re Jason J.* (2009) 175 Cal.App.4th 922, 936 (*Jason J.*).) The relationship is one characterized by a significant, positive, emotional attachment from child to parent, resulting from the parent's attention to the child's needs, and arising from frequent interaction, companionship, and shared experiences. (*Jason J.,* at p. 936*; In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The emotional attachment must be one of parent and child, rather than the attachment a child might feel to a "friendly visitor" or nonparent relative. (*Jason J.*, at p. 938; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) To establish the exception applies, a parent must show more than the child would gain *some* benefit from continuing a relationship with the parent. " 'A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree,* but that does not meet the child's need for a parent.' [Citation.]" (*Jason J.,* at p. 937.)

Substantial evidence supported the juvenile court finding that no beneficial parent-child relationship existed in this case. The evidence indicated that after the parents moved to Shasta County, K.Y. had merely "gotten to know them" by late October 2012. K.Y.'s only experience with the parents was limited to monitored visits. Although there was evidence K.Y. enjoyed playing with the parents, there was no evidence of a beneficial parental relationship between them.

There was evidence from the maternal grandmother that D.Y. loved her parents very much and liked spending as much time with them as schedules allowed. But,

although it was undisputed that after June 2012, the parents visited the children regularly, there was still no evidence that the relationship between the parents and D.Y. was more than one of pleasant *supervised* visits. D.Y. was only three years old when she was removed from the parents' custody, and, for almost a year, the parents did not visit her regularly. The evidence in the record indicated the maternal grandparents handled parental tasks such as taking the children to medical appointments and participating in developmental services. There was no evidence that the parents had taken on a parental role with either child. There was no evidence that the children had difficulty separating at the end of visits. Evidence of frequent and loving contact alone is not sufficient to establish the existence of a beneficial parental relationship. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316.)

Moreover, even assuming there was evidence of a beneficial parental relationship, the juvenile court did not abuse its discretion in concluding the relationship did not constitute a compelling reason for determining that terminating parental rights would be detrimental to the children. (*Marcelo B., supra,* 209 Cal.App.4th at p. 644 [despite warm and affectionate relationship with child, substantial evidence supported finding child would not suffer detriment from termination of relationship].) By the time of the section 366.26 hearing, the parents had not moved beyond supervised visitation. While there was evidence the children enjoyed spending time with the parents, there was no evidence in the record that termination of the parent-child relationship would be detrimental to the children, or that the relationship "conferred benefits [to the children] more significant than the permanency and stability offered by adoption." (*K.P., supra,* 203 Cal.App.4th at p. 623; *Marcelo B., supra,* 209 Cal.App.4th at p. 644; *Jason J., supra,* 175 Cal.App.4th at p. 938.) Neither the parents' relocation to Redding, nor the regularity and frequency of the parents' visits between June and October 2012, was evidence that the parents' relationship with the children was such that the children would be greatly harmed if parental rights were terminated. We can find no abuse of discretion in the court's conclusions.

## DISPOSITION

The juvenile court order is affirmed.

BIGELOW, P. J.

We concur:

RUBIN, J.

FLIER, J.